870 A.2d 697 (2005)
376 N.J. Super. 394
NEW CONCEPTS FOR LIVING, INC., Plaintiff-Appellant,
v.
CITY OF HACKENSACK, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued Telephonically February 16, 2005.
Decided April 13, 2005.
Arthur Thibault, Liberty Corner, argued the cause for appellant (Apruzzese, McDermott, Mastro & Murphy, attorneys; Mr. Thibault, of counsel and on the brief).
Donald J. Lenner, argued the cause for respondent.
Before Judges KESTIN, LEFELT and ALLEY.
The opinion of the court was delivered by
ALLEY, J.A.D.
Plaintiff, New Concepts, Inc., appeals the loss of its local property tax exemption for tax years 2000 and 2001 on a building that it owns in Hackensack. New Concepts, a private non-profit entity, was originally formed by parents of young disabled adults. Its purpose was to establish group homes for disabled adults. The entity currently runs seven group homes. During the mid-1990's, plaintiffs bought the building in question, located at 795 Main Street in Hackensack, and maintained an office *698 there. On February 19, 1998, plaintiff ceased using that building as an office, relocated to 386 Hudson Street in Hackensack for eighteen months, and then permanently moved to Rochelle Park. Plaintiff continued to own the building at 795 Main Street, however, and rents the space there to another non-profit entity. During its occupancy of the building, plaintiff, as a non-profit organization, was exempt from paying property taxes on the building.
On October 12, 1999, the Hackensack Tax Assessor, Arthur Carlson, attempted to send a letter to plaintiff at the 795 Main Street address. The letter requested that plaintiff complete some paperwork so that information on the property could be updated. Enclosed was an "Initial Statement" form "to be filed, to continue tax exempt status." This letter was returned by the Postal Service to Carlson on October 15, 1999, with the reason for the return stamped thereon as "forwarding expired."
In a certification dated March 26, 2002, Carlson described the circumstances surrounding the mailing and subsequent return of this letter. He further certified that while on a later periodic inspection tour of the City, he saw a sign reading "New Concepts for Living" at 386 Hudson Street, Hackensack, New Jersey. He then mailed an October 15, 1999 letter, similar to that mailed on October 12, to the Hudson Street address via certified mail and someone at that address accepted this letter. Unlike the October 12 letter, the October 15 letter did not refer to or enclose an "Initial Statement" form that needed to be completed by plaintiff "to continue tax exempt status."
The City later mailed to plaintiff, on January 30, 2001, Tax Assessment Notices for years 2000 and 2001 for 795 Main Street. Carlson stated that he "placed the subject property back on the tax rolls beginning in 2000" based on his "initial inspection of the subject premises and lack of input from the property owner[.]" The assessment notices were mailed to the 795 Main Street address though the City was aware of plaintiff's change in address and, as a result, plaintiff never received the assessment notices and they were returned to the City. In addition, the tax bills for 2000 and 2001 were sent to the wrong address, even though plaintiff's operations were no longer located there, something that the City's tax collector, Peggy Moncrief, confirmed in her certification.
Plaintiff did receive, however, a notice of municipal tax sale of the 795 Main Street property in July 2001 to satisfy unpaid 2000 taxes; the notice was provided by phone and letter. The letter stated that the tax sale was scheduled for October 10, 2001. Plaintiff's attorney, James Plosia, testified that upon receiving this notice, he contacted the City, speaking with, among others, Carlson and Moncrief. Plosia remembered explaining to the City that the bill was a mistake since the property had been tax-exempt, and even upon plaintiff's relocation, that plaintiff leased the premises to another non-profit organization, thereby retaining its tax-exempt status. He further stated that as a result of these conversations, he submitted to the City documentation that the premises were rented to a non-profit organization, as well as "corporate reports and financial statements from New Concepts for Living to establish that New Concepts was not making any money off this lease, thereby not jeopardizing the tax-exempt status of the property[.]"
According to Plosia, one of the City officials, either its attorney or the Tax Assessor, as Plosia recalled, said that the City would reassess the situation after plaintiff submitted documentation to support *699 its position that the property should still be tax-exempt. He sent a letter to the City on September 25, 2001, stating that plaintiff had sent the requisite documentation to the City. With the tax sale approaching, the City agreed to adjourn the tax sale scheduled for October 10, 2001, and postponed the sale to December 7, 2001.
During this period, Plosia was also in contact with Donald Lenner, the City's Special Tax Counsel. Lenner stated that he received a letter on October 22, 2001, from Plosia explaining the situation and requesting that the City come to a decision regarding the tax bills for 2000, 2001 and the future. Lenner responded in a letter dated November 2, 2001, stating
with respect to the assessment for the previous years of 2000 and 2001, the failure of New Concepts to file an appeal is dispositive of the matter and the underlying issue need not be addressed. With respect to the claim for 2002, this is under consideration by the Tax Assessor and I offer no opinion as to whether or not New Concepts is entitled to an exemption.
The letter further provided that plaintiff had the "right to petition the governing body to grant a retroactive application of exemption, but the burden remains on New Concept to prove its right to the exemption."
Plosia became concerned, especially because the tax sale was approaching. He contacted the Bergen County Tax Appeal Board in an attempt to appeal the City's decision. The Tax Appeal Board informed him that plaintiff was "out of time" to file an appeal.
On November 20, 2001, Carlson wrote plaintiff stating that it was not eligible for tax-exempt status for 2002. On November 28, 2001, Plosia, by letter to Lenner, directly petitioned the tax officials on behalf of plaintiff "to obtain a retroactive application of New Concepts' tax exemption for the property located at 795-99 Main Street in Hackensack." He attached the Certificate of Incorporation and By-Laws of the Center for Family Support, New Jersey, Inc. (CFS), the lessee of plaintiff's 795 Main Street building, and an IRS letter addressed to CFS stating that it had been granted tax-exempt status.
With the tax sale two days away, plaintiff decided to apply for an Order to Show Cause on December 5, 2001, and also filed a Verified Complaint against Hackensack in the Tax Court of New Jersey. Plaintiff sought to restrain the tax sale originally scheduled for December 7, 2001, and to appeal the City's decision denying plaintiff's request for tax-exempt status.
On December 6, 2001, the Tax Court issued a Temporary Restraining Order, on consent of the parties, against the City's sale of the property scheduled for the following day. The City filed a motion to dismiss and the court held a plenary hearing on "whether plaintiff should be excused from having to file its tax appeals for tax years 2000 and 2001 within forty-five (45) days from notice of change in exempt status[.]"
After oral argument, the court dismissed plaintiff's complaint and entered its written order on May 5, 2004.
In appealing, plaintiff asserts that it in fact filed its appeal for tax years 2000 and 2001 in a timely manner since it never received a notice of assessment or a tax bill; that the city is equitably estopped from asserting the forty-five-day statute of limitations as a bar to the appeal; and that the City is barred from raising the statute by reason of the doctrine of "square corners." It is unnecessary for us to discuss the first two of these contentions because *700 we are satisfied that the latter ground provides an adequate basis for disposition.
According to N.J.S.A. 54:4-38.1, before February 1, every assessor "shall notify by mail each taxpayer of the current assessment and preceding year's taxes." A taxpayer must be notified within thirty days of any changes in its taxes. Such notice from the assessor "shall contain information instructing taxpayers on how to appeal their assessment." N.J.S.A. 54:3-21(a) sets forth the relevant time periods in which an appeal must be filed.
[A] taxpayer feeling aggrieved by the assessed valuation of the taxpayer's property, or feeling discriminated against by the assessed valuation of other property in the county, or a taxing district which may feel discriminated against by the assessed valuation of property in the taxing district, or by the assessed valuation of property in another taxing district in the county, may on or before April 1, or 45 days from the date the bulk mailing of notification of assessment is completed in the taxing district, whichever is later, appeal to the county board of taxation by filing with it a petition of appeal ... A taxpayer shall have 45 days to file an appeal upon the issuance of a notification of a change in assessment.
In deciding the City's motion, the trial judge stated:
[A]fter an initial determination that the complaint is filed or upon the evident fact that the complaint is filed after April 1, the plaintiff in order to demonstrate an exemption from the statutory requirement of filing on April 1, initially, attempts to demonstrate that it acted within a reasonable period of time following actual notice of assessment, or initially, it says that I didn't have the notice of the assessment in time to act by April 1 and I am entitled under the rules recently elaborated in a series of tax court decisions ... [because] I am entitled to 45 days from actual notice of the assessment.
Actual notice of the assessment is a date not later than the summer of 2001, July specifically, and it is clear and, again, from simply looking at the calendar and the dates on which the filing occurred, that being December of 2001, that more than 45 days elapsed between actual notice of the assessment in July, and the filing of the complaint in December whereupon the plaintiff invokes an additional basis to excuse its late filing; namely, that during the 45-day period following actual notice, the course of conduct of the defendant, and I suppose to some extent, also the County Board of Taxation, somehow excused the plaintiff from filing its tax court complaint.
I'm unable to accept the factual and legal contentions of the plaintiff in this regard. I do not believe that the facts demonstrate any basis for a conclusion that the plaintiff is entitled to the benefit either of the rule of equitable estoppel or the claimed rule of square corners.
....
So, ultimately, I conclude that in this case, that whatever was going on between Hackensack and New Concepts in the 45-day period following actual notice of the assessment or in the nature of the exploration of potential settlement of the issues between the parties, and in particular, with regard to settlement under the statute permitting the allowance of a retroactive exemption, they did not as such amount to a promise that relief would be given, or to a specific waiver of the statute of limitations, and as such, the plaintiff is bound by the statute of limitations and having failed to file within 45 days for actual notice of the assessment, *701 may not pursue the complaint filed in this action for the years 2000 and 2001.
We observe in passing that the Tax Court may have taken an unduly restrictive view of plaintiff's ability to make out a claim of estoppel. Because, however, we are able to dispose of the appeal on other grounds, we do not examine in depth the trial court's decision that plaintiff failed to establish a claim for estoppel against the City. We note in that connection, moreover, that, in general, equitable estoppel "rarely" can be established against a governmental body or agency. Ryan v. N.J. Racing Comm'n, 336 N.J.Super. 237, 243, 764 A.2d 486, 489 (App.Div.2001).
Where we part company with the Tax Court, however, is over its denial of relief to plaintiff based on the "square corners" doctrine.
The government must "turn square corners" in its dealings with the public. F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 426, 495 A.2d 1313, 1317 (1985) (quoting Gruber v. Mayor & Tp. Committee of Raritan Tp., 73 N.J.Super. 120, 179 A.2d 145 (App.Div.), aff'd, 39 N.J. 1, 186 A.2d 489 (1962)). This requires that the government:
not conduct itself so as to achieve or preserve any kind of bargaining or litigational advantage over the property owner. Its primary obligation is to comport itself with compunction and integrity, and in doing so government may have to forego the freedom of action that private citizens may employ in dealing with one another.
[Id. at 427, 495 A.2d at 1318.]
In determining whether the City, in dealing with plaintiff, a member of the public, "turned square corners," the Tax Court judge stated:
Now, on the question of square corners, which does appear to allow a litigant adverse to a governmental party the benefit of certain rules, in addition to those that are covered under the doctrine of estoppel. I don't believe that the square corners rule, I believe, is essentially that a governmental party may not claim a litigation advantage against a private party as a result of conduct undertaken by either of the two parties.
The Pangborne decision, I think is a very narrow one that needs to be regarded as extremely fact sensitive and concerned with the particular circumstances that are dealt with in that case where the parties proceeded in such a manner as though to pursue the possibility of resolution of their dispute and in an alternative forum; namely, the legislative claims committee, and the pursuit of the issue if that alternative forum might reasonably be concluded to have been the preliminary for ultimate litigation between the parties.
In the present case, the possibility of allowing the retroactive exemption, which is, I believe, the appropriate event to compare the claims committee proceeding with, the possibility of allowing the tax exemption under the statute permitting a retroactive tax exemption is not such an alternative proceeding or is not a proceeding before an alternative forum that can be regarded as a preliminary step to litigation between the parties.
Rather it is in the essential nature of ongoing and continuing settlement discussions between the parties themselves. And to recognize an exemption to the statute of limitations in this case appears to me to do no more than to say, well, because the parties were continuing to negotiate up until the time of the *702 running of the statute, and because the taxing district did have the opportunity as a matter of grace to allow what it might have been compelled to do in litigation, therefore, the plaintiff did not have to file a timely complaint, to say that is to say not much different from that continuing discussions and settlement negotiations somehow operate to toll the applicability of the statute of limitations and I think that that is an incorrect and indeed a dangerous proposition for a court to embrace.
In W.V. Pangborne & Co. v. New Jersey Department of Transportation, 116 N.J. 543, 554, 562 A.2d 222, 227 (1989), the Court held that the Division of Transportation should have been clearer regarding the applicable statute of limitations as it encouraged plaintiff to pursue an administrative proceeding which only assisted itself in the discovery process. Id. at 562, 562 A.2d at 231-32. The Court noted that "[t]he failure to deal expressly with this subject [of statute of limitations] can create confusion, disagreement, and the disappointment of reasonable expectations that smacks of unfairness." Id. at 562, 562 A.2d at 231. For this reason, the Court held that the DOT could not rely on the statute of limitations defense. Id. 562-63, 562 A.2d at 231-32.
Neither the City's arguments nor the reasons given by the trial judge impel the conclusion that the holding in Pangborne should be limited to the precise facts of the case. As stated by the New Jersey Supreme Court, Pangborne, supra, 116 N.J. at 563, 562 A.2d at 232, "The primary purpose of the statute of limitations is to provide defendants a fair opportunity to defend and to prevent plaintiffs from litigating stale claims."
Although plaintiff probably had an obligation to notify the assessor that it had relocated its operations and had leased the property to another entity, here, however, the City failed to properly notify plaintiff in 1999 of the purported need to reapply for the tax exemptions. The City did not enclose the Initial Statement tax exemption form needed to apply for continued tax-exempt status. Nor, as we understand the record, did plaintiff receive tax assessment notices or tax bills for those years, as they were mailed to the property address rather than to where plaintiff's operations were located. Therefore, plaintiff was unaware that taxes were assessed against the property and were delinquent until plaintiff received the notice of the municipal tax sale in July 2001. After learning of the scheduled municipal tax sale, plaintiff's counsel promptly contacted officials of the City, who represented that the City would reassess the situation and further agreed to adjourn the tax sale after plaintiff submitted further information, which plaintiff did.
It appears that the City never made mention of the limitations period, but inequitably and suddenly reversed its position, availed itself of a technicality. It claimed that plaintiff could not argue its tax-exempt status for the preceding two years simply because plaintiff had not formally appealed its assessment within forty-five days of receiving the notice of tax sale. The City, having lulled plaintiff into a false sense of security, reversed its position despite having led plaintiff to believe that it was willing to work with plaintiff in a fair, informal and reasonable manner to fashion a remedy to plaintiff's problem. It is obvious that the "square corners" doctrine cannot be applied with rigidity or undue technicality. Here, the Supreme Court's recent observations with respect to the covenant of good faith and fair dealing inherent in every contract are pertinent: "We cannot catalogue the myriad forms of conduct that may constitute a violation of the covenant of good faith and fair dealing. Each case is fact-sensitive." Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping *703 Center Assoc., 182 N.J. 210, 225, 864 A.2d 387, 396 (2005). In Brunswick Hills Racquet Club, the Court applied the doctrine of good faith and fair dealing to preclude an inequitable result even though the party that benefited from the application had been represented by counsel and the other party, which had been dealing with it at arms-length, had not affirmatively led it into the mistake which, but for the application of the doctrine, would have caused it to lose its rights under the subject agreement. Id. at 214, 864 A.2d at 389.
We also note a further recent pertinent decision from the Court which concluded:
To summarize, the record amply supports the trial court's finding that NJM's conduct lulled plaintiff and his counsel into believing that the uninsured motorist claim had been properly filed. Plaintiff reasonably relied on NJM's conduct in failing to file a complaint or to request arbitration within the statute of limitations period. That limitations period "should not become a[n] instrument of injustice." Procanik by Procanik v. Cillo, 97 N.J. 339, 351, 478 A.2d 755[, 762] (1984). The fair resolution of this matter is to permit plaintiff to arbitrate his claim. NJM acknowledged that it was not prejudiced and there is no suggestion otherwise. Most importantly, the result here is not repugnant to the policies served by the statute of limitations. W.V. Pangborne & Co., Inc., supra, 116 N.J. at 563, 562 A.2d 222[, 232]. We conclude the trial court properly rejected NJM's statute of limitations defense.
[Price v. N.J. Mfrs. Ins. Co., 182 N.J. 519, 523, 867 A.2d 1181, 1184 (2005); See also White v. Karlsson, 354 N.J.Super. 284, 290-92, 806 A.2d 843, 847-48 (App.Div.), certif. denied, 175 N.J. 170, 814 A.2d 635 (2002) (holding that in light of a weighing of the equities, and in order to avoid "apply[ing] strictly and uncritically a statutory period of limitations without considering conscientiously the circumstances of the individual case [,]" Kaczmarek v. N.J. Tpk. Auth., 77 N.J. 329, 338, 390 A.2d 597, 602 (1978), a statute of limitations defense could not be applied equitably in the case where defendant failed to pursue the defense and plaintiff expended significant resources in preparation for trial, unaware that defendant might eventually seek to rely on the defense).]
The law is rarely capable of precise categorization and exact definition. A conclusion that may be reasonable on one set of facts may be inequitable on another. Our equitable powers cannot be exercised or withheld rigidly, but are always subject to the guiding principles of fundamental fairness. In our view, such recent authorities as Brunswick Hills and Price, supra, confirm the importance of avoiding unnecessary doctrinal rigidity with respect to the overriding principles of fairness, and the wisdom of acting interstitially on occasion to reach a wise and equitable result. We conclude that the City did not act with the fundamental fairness required of it under the square corners doctrine, and as a result the order of the Tax Court cannot stand. Indeed, to seek to deprive plaintiff of its property in the face of the City's manifestly unfair and uncandid conduct is inequity itself.
Plaintiff thus is entitled to be heard on its appeal of the tax assessment for the tax years in issue and we remand to the Tax Court to afford plaintiff the opportunity to be heard on that issue and, if appropriate, to be granted a tax exemption for the subject property for those tax years.
Reversed and remanded.